UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JESSICA SCHROEDER,

       Plaintiff,

v.

CRACKER BARREL OLD COUNTRY
STORE, INC.,

       Defendant.

_____/

Case No. 08-13520

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT [22]**

This matter, alleging claims of sexual harassment and retaliation in violation of
Michigan's Elliott Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2103, et seq.,
comes before the Court on Defendant Cracker Barrel Old Country Store, Inc.'s motion for
summary judgment. Defendant's motion is DENIED. Genuine issues of material fact exist
whether (1) Defendant conducted an adequate investigation and took prompt and remedial
action upon notice of Plaintiff Jessica Schroeder's claims of sexual harassment; and (2)
Plaintiff was retaliated against and constructively discharged after notifying Defendant that
she was sexually harassed by her supervisor.

**I.     Facts**

Plaintiff Jessica Schroeder began working for Defendant's Roseville, Michigan
restaurant in September 2006 as a server. (Pl.'s Dep. at 39; Schlender Dep. at 16-17.)
This lawsuit alleges that one of her supervisors, Associate Manager Scott Schlender,

sexually harassed her and retaliated against her after she notified Defendant about his inappropriate conduct.  As required on a motion for summary judgment, the facts are taken in the light most favorable to the non-moving party; Plaintiff here.

At Defendant's Roseville restaurant, where Plaintiff worked, Dennis Gordon was the General Manager and the highest management representative on the premises.  (Gordon Dep. at 7-9.)  Gordon's immediate supervisor was District Manager Imad Mustafa.  (Gordon Dep. at 9.)  Mustafa traveled to other locations in his territory, but had almost daily contact with the Roseville location.

Scott Schlender was one of four associate managers at Defendant's Roseville location.  (Gordon Dep. at 9.)  Schlender had authority over servers like Plaintiff with regard to scheduling, quarterly performance evaluations, discipline, and having documents placed in their personnel files.  He also had the authority to fire a server if the General Manager, Dennis Gordon, approved.  (Schlender Dep. at 10-11; Gordon Dep. at 17-29.)  As an Associate Manager, Schlender was Plaintiff's supervisor when they worked together.  (Schlender Dep. at 17-18.)  Plaintiff and Schlender worked together a couple of times each week.  (*Id.* at 18.)  Plaintiff was a good employee and was used as a trainer for new employees.  (*Id.* at 22-23.)

The core events giving rise to this lawsuit took place from Spring 2007 through December 2007.  Plaintiff testified that Schlender began engaging in inappropriate conduct directed toward her.  He repeatedly pulled on her ponytail and said, "When you pull back a woman's hair, her mouth opens.  Now I know how big it is."  He would strike her on the buttocks with a wet towel, one time causing a bruise.  When she would object, he would reply, "You know you like it."  He would ask her if she liked to be tied up, if she was happy

2

with her husband, and if she swallows."  When she asked for a small to-go container, he

replied with a sexual innuendo about his genitals: "There are no small packages back here.

If you want something, you come back here and get it."  (Schroeder Dep. at 78-82, 85-89

Plaintiff also alleges that, around June 2007, in the vestibule of the Roseville restaurant,

Schlender put her arm behind her back, shoved her up against the wall, and asked her if

she was one of those bitches that likes Saran wrapped around her face  and shit rubbed

into it and likes having her head smashed into the headboard and being "done" from

behind.  (Pl.'s Dep. at 76-78.)   Although she complained to co-workers, Plaintiff did not

notify Defendant's management or employee relations department about Schlender's

inappropriate conduct until August 2007.  (*Id.* at 78-80.)

Defendant's motion focuses on its response to Plaintiff's complaints made in August

2007.

In August 2007, Scott Schlender was working 55 to 60 hours a week and worked

several days a week with Plaintiff.  (Schlender Dep. at 23.)  On August 9 and 10, 2007,

Plaintiff made two anonymous complaints about Schlender's sexual harassment of her and

other females at the Roseville location to Defendant's employment relations department

on the e-mail system set up for this purpose.  The first was made at 10:50 p.m. on August

9th and the second at 7:45 a.m. the next morning.  In both anonymous complaints, Plaintiff

indicated that she was afraid to bring the matter to her manager's attention because others

had made similar complaints and nothing was done.  (Def.'s Exs. F and G.)

On August 10, 2007, Shelly Lanius from Defendant's employment relations

department, reviewed both complaints, closed the first because it was the same as the

second, and emailed the second to the General Manager Dennis Gordon and District

3

Manager Imad Mustafa.  (Def.'s Ex. G, 8/10/07, 3:14 p.m. entry.)   Mustafa admitted that the anonymous complaint came to his attention right away.  (Mustafa Dep. at 17, 22, 30.) Mustafa has no recall of what action he took in response but testifies that normally he would instruct the general manager to "keep an eye out," to interview all employees that were alleged victims of sexual harassment, obtain their written statements, and after completing that, to finally interview and obtain the written statement of the alleged sexual harasser, and then report back to him with the results.  (Mustafa Dep. at 31-34.)

General Manager Gordon testified that he does receive anonymous email complaints that are forwarded to him from Defendant's home office.  (Gordon Dep. at 33.)  He cannot recall when he got the two August 2007 anonymous complaints.  (*Id.* at 39-41.)  Likewise, he does not recall when he spoke with Plaintiff and other female employees about these allegations.  He does recall speaking with Plaintiff, but does not recall when, what she said, or whether he asked her for a written statement.  (Gordon Dep. at 44-47.)  Gordon has no memory of talking with Schlender about the allegations during the second week in August 2007.  (Gordon Dep. at 42.)

The accused harasser, Scott Schlender, testified that these employment relations complaints, known as tickets, are sent to the restaurant's email, and he first learned of the sexual harassment allegations against him when he read the email from Defendant's corporate office.  (Schlender Dep. at 29-31, 36.)  He does not recall if he talked to General Manager Gordon at that time about the allegations.  (*Id.* at 31.)

Despite both Mustafa's and Gordon's lack of recall, an investigation of Plaintiff's allegations had obviously begun before August 21, 2007.  (Def.'s Reply Ex. F, 8/19/07 statement provided by an Elaine M. denying that she was sexually harassed; Reply Ex. G,

4

8/20/07 statement provided by Mary Ferris that she had been questioned on 8/19/07 and had denied that she was sexually harassed.)

On August 21, 2007 at 9:15 a.m., Plaintiff filed another complaint about Schlender's sexual harassment on Defendant's email reporting system. This time she identified herself. (Def.'s Ex. I, Ticket #750467.) Plaintiff specifically alleged that Schlender had repeatedly smacked her in the buttocks with a wet towel, had asked her very vulgar and disgusting things, and had pulled her hair, among other things. (*Id.* at 1.) She also reported that (1) General Manager Gordon had approached her about Schlender, (2) she explained to Gordon that she had not reported this to him earlier because there had been so many other incidents and nothing was done, (3) Gordon told her that he would look into the matter, (4) she subsequently learned that another alleged victim was told if nothing had happened in the last couple of days that she was to write in her statement that the alleged sexual harassment never happened, and (5) she had previously reported Schlender's sexual harassment to her shift leader Leo Hicks. (*Id.* at 1-2.)

By 10:52 a.m. that same day, Shelly Lanius of Defendant's employment relations department had reviewed Plaintiff's on-line complaint. At 4:33 p.m., Ms. Lanius called Plaintiff and left her a voice message. She also mailed and emailed a letter to Plaintiff asking her for more information. At 4:36 p.m., Plaintiff returned Ms. Lanius's phone call and provided more information about her sexual harassment claims.

Plaintiff explained that several other employees have complained about Schlender, but nothing was done. That is why she did not report this earlier. She explained that on August 9, 2007 she spoke with her shift leader Leo about how Schlender told her that he was going to make her life a living hell there. When Leo told her to report it, she made the

5

anonymous complaints.  Her General Manager Gordon confronted her about the sexual harassment allegation, asking her if she had been sexually harassed at work.  She replied that she had by Scott Schlender, and Gordon told her that she may be questioned further. She reported that on August 20, 2007, General Manager Dennis Gordon was questioning people and had restricted his questions to inappropriate sexual harassment occurring within the last few days.  The call was cut off.  (*Id.* at 10, 8/21/07 4:36 p.m. entry.)

Plaintiff immediately called Ms. Lanius back, providing the names of other female employees that Schlender had sexually harassed.  Plaintiff also told Ms. Lanius that she was afraid to go back to work, that she had told her General Manager that she was afraid, and that Schlender had tried to get her to close the restaurant with just the two of them present.

> Jessica is afraid to go back to work & she works a lot of hours.  She has worked there a couple of years.  Now that she has made this report she feels like she is nothing because Dennis [Gordon] is not keeping her informed.  Dennis [Gordon] asked her if she had wrote a statement yet & she said no.  She has already told Dennis [Gordon] that she is afraid.  Scott [Schlender] has tried to get her to close with him.  She does not want to close by herself.  Scott [Schlender] will try to send everyone home & keep her there by herself.

(*Id.* at 9, 8/21/07 4:42 p.m. entry.)  Ms. Lanius emailed Plaintiff's complaint to both Mustafa and Gordon.  (*Id.* at 10, 8/21/07 4:41 p.m. entry.)

On August 21, 2007, at 5:32 p.m., Plaintiff's latest complaint was reviewed by Tonyia Jones of Defendant's employment relations department.  The next day, she changed the status to "pending."  She also spoke with District Manager Imad Mustafa about Plaintiff's earlier anonymous complaint and was informed that an investigation was under way and that Gordon was gathering statements.  (Def.'s Ex. G, Ticket # 746052, 8/22/07 10:10 a.m.

entry.)  On August 24, 2007, the earlier anonymous complaint was closed and a reference was made to Plaintiff's third complaint, Ticket #750467.  (*Id.* at 8/24/07 2:23 p.m. entry.)

Plaintiff's statement was faxed to Defendant on August 23, 2007.  (Pl.'s Ex. 7.)  It reports that she was interviewed by General Manager Dennis Gordon on August 16, 2007.  She provided him with the following information.  She and other females at Defendant's Roseville location had been sexually harassed by Schlender.  Specifically, Schlender (1) grabbed her by the arm in the back vestibule, pushed her against the wall and asked her if she was one of those girls that like Saran wrap put on her face and then have shit rubbed on it and liked to be "done" from behind; (2) pulled her hair and asked if she knew why he did that and then responded that it was because it's a girl's normal reaction to open her mouth and he wanted to see how big her mouth was; (3) responded to her request for a small to-go box by telling her "There's nothing small back here, you need to come get what you need"; (4) repeatedly hit her in the buttocks with a wet towel from a sanitizer bucket, bruising her one time, and asking, "Did that hurt.  You like it rough Jessica don't you;" and (5) blocked her as she attempted to walk through the server aisle, and then, as she moved past him, would bump her, make vulgar comments, or give her a grin and say, "You know what I'm thinking."  (*Id.* at 1-2; Pl.'s Dep. at 75-92.)

Plaintiff further reported that, on August 9, 2007, she went to her shift leader Leo Hicks and told him about Schlender's inappropriate conduct.  She did this because on August 8, 2007, Schlender told her that he can and will make her life hell and that Schlender becomes hostile if she doesn't accept his comments or behavior.  (Pl.'s Ex. 7 at 2.)  She also explained that she did not report any of this to her General Manager Dennis Gordon earlier because she thought it would be pointless.  There had been earlier incidents

7

concerning Schlender and nothing was done and the girls who were being harassed either quit or got fired. She concluded that she had three children and needed a job but could not tolerate this situation any longer. (*Id.* at 3.)

By late August 2007, as a result of Defendant's investigation into Plaintiff's allegations, General Manager Gordon and District Manager Imad Mustafa had obtained statements from two employees that confirmed Plaintiff's allegations that Schlender had sexually harassed her. Notes taken during those interviews reveal that another server, Julie LaPorte, reported that she had witnessed Schlender touching or slapping other female employee's butts as they walked by and had seen him pull their pony tails and say, "If you pull someone's hair, their mouth opens. The notes indicate that Julie LaPorte saw Schlender do this to Plaintiff. (Pl.'s Ex. 10, handwritten notes of Mustafa investigation with 8/27/07 fax date and Cracker Barrel identification.) Another employee, Leo Hicks, also confirmed the he too had witnessed Schlender's inappropriate touching of female employees. (Gordon Dep. at 72-73.)

In August, while the investigation was on-going, Plaintiff asked her General Manager Gordon if he could arrange it so she did not have to work the same shift as Schlender, explaining that it made her uncomfortable in light of the circumstances. Gordon had allowed Schlender to continue supervising her. (Gordon Dep. at 75-76.) It is also undisputed that Schlender was aware that Plaintiff was the one who had made complaints of sexual harassment against him. (Gordon Dep. at 76-77.) Plaintiff had also informed Shelly Lanius from Defendant's employment relations department that, by August 21, 2007, she had informed her General Manager Dennis Gordon that she was afraid to work with Schlender, that Schlender had tried to get her to "close" the restaurant with him, and that

8

she was afraid that if she was forced to work the same shift as Schlender he would send everyone else home and keep her there with him by herself.  (Def.'s Ex. I, 8/21/07 4:42 p.m. entry.)

Plaintiff's request was denied.  (Pl.'s Dep. at 100-101.)   Gordon does not recall refusing to do so, but testified that he would have denied any such request because it would show bias or discrimination against Schlender.  (Gordon Dep. at 66.)

Sometime in late August 2007, Plaintiff had a severe anxiety attack at work.  Plaintiff testified that it was triggered by Schlender's conduct toward her after he became aware of her allegations against him.  Specifically, she testified that he kept following her around while she was at work, invading her space and getting too close to her, staring at her, making noises at her while sucking on his teeth, and also put her in sections with fewer customers.  (Pl.'s Dep. at 114-17.)   One day, when Schlender was acting in this manner, Plaintiff's chest got really tight, and she was having trouble breathing.  Another associate manager, Debbie Jewitt, and a co-worker, Debbie Ferris, took her into the back break room, sat her down, and got cold towels and water, in an attempt to assist her.  (*Id.* at 117-18.)  While this was happening, Schlender came into the back break room, sat down next to Plaintiff, and kept staring at her.  He refused to leave.  Finally, Plaintiff's sister Michele Jenkins came to pick her up.  She went home, cried, and decided that she could not do this anymore.  (*Id.* at 118-19.)  General Manager Dennis Gordon "vaguely" recalls Plaintiff's anxiety attack.  (Gordon Dep. at 82.)  Schlender admits that he was in the break room that day with Plaintiff and that he sat down.  He denies that he made "smacking" noises with his mouth.  He also denies that he was asked to leave.  (Schlender Dep. at 40-42.)

On September 2, 2007, Plaintiff went into work and told General Manager Dennis Gordon that she needed to speak with him.  She told him that she could not work at Cracker Barrel any more, reminded him that she had told him earlier that she could not work with Schlender because of the way he treats her, and handed Gordon the envelope with her resignation letter and a pin that he had given her when he promoted her.  (Pl.'s Dep. at 119-20.)  Plaintiff's September 2, 2007 resignation letter to Gordon states:

> I Jessica Schroeder am being forced to resign my position at Cracker Barrel (store # 208) due to intolerable working conditions.  The intolerable working conditions in which I am referring, consist of severe ongoing sexual harassment and assaultive behavior by Scott Schlender.  Nothing has improved since my several complaints to management and corporate.
>
> I have enjoyed working for you at Cracker Barrel; however, being forced to put up with Scott Schlenders [sic] unacceptable behavior as well as being forced to resign my position has caused me a great deal of stress and humiliation.

(Pl.'s Ex. 11, 9/2/07 letter.)

On September 5, 2007, at 8:33 a.m., Tonyia Jones from Defendant's employment relations department placed an "internal correspondence" on Plaintiff's complaint Ticket #750467, stating that General Manager Dennis Gordon had reported that Plaintiff had walked off her job on Saturday, September 1st, telling him that her Associate Manager Jody had yelled at her and noting that Gordon was going to fax over statements from two associate managers and an employee.  (Def.'s Ex. I at 8, 9/5/07 8:33 a.m. entry.)

On September 5, 2007, at 8:48 a.m., Tonyia Jones placed another "internal correspondence" on the same Ticket #750467, stating that Schlender would be out for the next six weeks:

> Due to a serious medical condition with AM, Scott's fiancé, he is on leave effective 9/8 and will be out at least 6 weeks.  He will be taking two weeks vacation and a month personal leave.  A interview will be conducted with him

upon his return after all of the store statements are collected and a determination will be made on the allegations made by Jessica Schroeder.   I will contact Jessica by phone.

(*Id.* at 7-8, 9/5/07 8:48 a.m. entry.)  As evidenced from this entry, as of September 5, 2007, Schlender had not yet been interviewed about Plaintiff's allegations of sexual harassment.

Schlender testified that there were several months between the time he first learned in August 2007 about Plaintiff's sexual harassment allegations against him and the time he was interviewed.  He does not recall being asked earlier than November 2007 to make time for an interview.  (Schlender Dep. at 49-54.)

Schlender testified that he first took vacation in September 2007 while his fiancé was ill because they were not yet married.  After they were married, he took a leave of absence.  (Schlender Dep. at 46-47.)   Schlender's formal FMLA leave of absence began on September 20, 2007 and ended on October 13, 2007.  (Pl.'s Ex. 13, 5/11/09 letter from defense counsel.)

On October 9, 2007 at 3:04 p.m., Tonyia Jones from Defendant's employment relations department sent an internal correspondence to District Manager Imad Mustafa inquiring whether Schlender had returned and reminding him that "[w]e need to get his statement and interview him based on the allegations if he has returned.  Please let me know.  Tonyia."  (Def.'s Ex. I  at 7, 10/9/07 3:04 p.m. entry.)

Schlender's FMLA leave ended on October 13, 2007, and he returned to work on October 15, 2007.  (Pl.'s Ex. 13.)

On October 19, 2007, at 12:10 p.m., Tonyia Jones's internal correspondence notation on Plaintiff's complaint Ticket #750467 documents that she spoke with District Manager Imad Mustafa.  He told her that Associate Manager Scott Schlender returned from leave

11

on October 15, 2007.  Mustafa had reminded Schlender that the investigation of Plaintiff's sexual harassment allegations would continue.  He also informed Ms. Jones that statements were being reviewed and that a follow-up would be conducted based on Schlender's statement.  (Def.'s Ex. I at 7, 10/19/07 12:10 p.m. entry.)

On October 22, 2007 at 12:03 p.m., via internal correspondence, Ms. Jones notified Mustafa that she had called the Roseville store to speak with General Manager Dennis Gordon and learned that he was on vacation this week.  She asked Mustafa whether he planned on being there that week; and if so, informed him that she wanted to speak with "Andy Z, Paul and Ayanna and possibly Lisa again." (*Id.* at 6-7, 10/22/07 12:30 p.m. entry.) She also informed him after statements were obtained from these individuals, she would like to speak with Schlender.  Finally, she wanted to know who was in charge while Dennis Gordon was on vacation.  (*Id.*)

On October 25, 2007 at 11:28 a.m., Ms. Jones documented on Plaintiff's complaint Ticket #750467 that she made a call and spoke with Associate Manager Rico concerning additional statements needed.  These included "Ayanna, Andy Z.  Ms. Jones also requested that Julie LaPorte be questioned to determine which Teresa allegedly was touched, and finally requested that she be informed as to Paul Beard's current store location.  (*Id.* at 6, 10/25/07 11:28 a.m. entry.)

Lisa Perri's October 25, 2007 statement, repeating that she has not seen or heard of any manager doing or saying anything inappropriate, was faxed to Cracker Barrel on October 29, 2007.  (Def.'s Ex. D.)  Similar statements prepared by Ayanna Brown on October 25, 2007 and Teresa Reynolds on October 27, 2007 were also faxed to Cracker Barrel on October 29, 2007.  (Def.'s Exs. L and M.)   There is no evidence of a statement

from Andy Z, who General Manager Gordon identified as a cook, but Gordon testified that Andy Z. did say that Schlender pulled a female employee's hair.  (Gordon Dep. at 87.)

On October 29, 2007 at 3:57 p.m., Ms. Jones documented that she received the requested statements by fax.  That same day, at 4:01 p.m., Ms. Jones spoke with Rico concerning the follow-up investigation.  Rico had contacted Paul Beard at Cracker Barrel store #51, and he stated that he really could not remember any thing that happened.  Rico said that he did re-question Lisa, and she said that she did not see anything inappropriate and that she had already shared that with Imad Mustafa.  Rico also spoke to Andy Z, and he said that he already spoke to Imad Mustafa and gave his statement.  Rico questioned Ayanna, and she said that she never saw anything inappropriate with managers.  General Manager Dennis Gordon was to follow-up with Andy and Ayanna.  Ms. Jones called store #51 to speak to Paul Beard, but he was not working and was to return on Wednesday.  (*Id.* at 6, 10/29/07 entries.)

On October 30, 2007 at 4:40 p.m., Ms. Jones notes on Plaintiff's complaint Ticket #750467 that she had called General Manager Dennis Gordon and left him a voice message telling him that she did not receive "the statement."  (*Id.* at 5, 10/30/07 4:40 p.m. entry.)

On November 6, 2007 at 10:58 a.m., Ms. Jones, via internal correspondence, asked District Manager Imad Mustafa if he had time either Thursday or Friday to speak to Schlender because "EAP" had given her the go-ahead to speak with him that week.  (*Id.* at 5, 11/6/07 10:58 a.m. entry.)

On November 9, 2007 at 10:14 a.m., Ms. Jones, via internal correspondence, documented that she and District Manager Imad Mustafa interviewed Schlender over the

13

phone concerning the allegations from Plaintiff.  She documented what was addressed in the telephone interview:

1.  Why would Jessica bring these allegations,
2.  Relationship with employee, Lisa Perri,
3.  Towel incident concerning the sanitizer bucket,
4.  Grabbing Jessica's arm and twisting it behind her back,
5.  Telling jokes in the unit,
6.  Bumping up against employees.

(*Id.* at 5, 11/9/07 10:14 a.m. entry.)  Ms. Jones reported that Schlender denied all of the allegations with the exception of telling a joke, which he admitted he might do once a month.  Schlender could not recall any jokes he may have told, but he said none would have been inappropriate.  Ms. Jones further reported that Schlender was asked to write a detailed statement addressing all that he was questioned on and was to forward the statement to the home office by email and to follow-up with a signed copy mailed to the home office.  (*Id.*)

Scott Schlender's written statement is as follows:

1.  Any outside contact with Lisa Perry.  NO
2.  Have I ever hit Jessica with a towel.  NO
3.  Inappropriate comments regarding to go boxes.  NO
4.  Have I ever pulled Jessica's hair or made comments about a natural reflex regarding what happens when you pull a woman's hair back.  NO
5.  Have I ever twisted Jessica's arm behind her back.  NO
6.  Stated that I would make her life a living hell.  NO

(Def.'s Ex. N, Schlender undated statement.)

On November 9, 2007 at 10:29 a.m., Ms. Jones also documented that District Manager Imad Mustafa was to contact Schlender that afternoon.  Ms. Jones also contacted Karen Franklin in "EAP" to let her know that Schlender "seemed agitated/frustrated about the follow up interview."  (*Id.* at 5, 11/9/07 10:29 a.m. entry.)

14

On December 3, 2007 at 10:33 a.m., Ms. Jones documented that on November 10, 2007, she had received a typed statement from Schlender denying all allegations from Plaintiff Jessica Schroeder. (*Id.* at 4, 12/3/07 10:33 a.m. entry.) Ms. Jones also documented that she attempted to reach Paul Beard, called his new contact number, and left him a message to call her back. (*Id.* at 4, 12/3/07 entries.)

On December 5, 2007 at 3:41 p.m., Ms. Jones interviewed Paul Beard. Beard worked at the Roseville restaurant on the grill for about 18 months. He told Ms. Jones that Schlender had an aggressive delivery manner, was easily upset, had talked to and intimidated an employee, Zelke, but he never witnessed any manager take a towel out of the sanitation bucket and snap an employee with it, never saw any manager pull an employee's ponytail, never saw any manager grab an employee's arm and twist it behind their back, and never heard any manager make an inappropriate comment. (*Id.* at 3, 12/5/07 3:41 p.m. entry.)

On December 10, 2007, Ms. Jones documented that she sent an e-mail with documentation for Schlender to District Manager Imad Mustafa for delivery. (*Id.* at 3, 12/10/07 10:02 a.m. entry.)

On December 10, 2007, Schlender received a verbal counseling. Defendant's Employee Counseling Report documents that "[a]llegations were brought forth that your behavior in the workplace could be perceived as inappropriate or unprofessional in nature. A thorough investigation was conducted and these claims could not be fully substantiated." (Def.'s Ex. K, 12/10/07 Employee Counseling Rept.) The corrective action included the following. "Cracker Barrel's anti Harassment Policy has been reviewed with you to ensure your understanding of the Company's expectation. Although the allegations against you

15

could not be fully substantiated, this counseling serves as a verbal counseling.  If there are future incidents of this nature, or new information is discovered that will substantiate these claims, you will be subject to further disciplinary action, up to and including termination." (*Id.*)  Schlender hand wrote comments on the report stating that he did "not agree with this," felt that an investigation was not conducted, and complained that he felt it was inappropriate to have two of his fellow associate managers taking part in the investigation rather than the General Manager Dennis Gordon.  (*Id.*)

Schlender resigned from Cracker Barrel in February 2008.  (Schlender Dep. at 56.)

Plaintiff filed her complaint against Defendant Cracker Barrel in July 2008 in state court.  Defendant timely removed the action to this Court based on diversity jurisdiction.

## II.    Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In

evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.   Analysis

### A.   Plaintiff's Sexual Harassment Claim

Defendant's motion for summary judgment, relying on the Michigan Supreme Court's decision in *Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 916 (Mich. 2000), argues that Plaintiff cannot establish a claim of sexual harassment against it under Michigan's ELCRA because she has not presented any evidence showing that Defendant failed to adequately investigate and take prompt and appropriate remedial action upon notice of Plaintiff's sexual harassment allegations.[1]   This Court disagrees.

Considering the evidence presented in the light most favorable to Plaintiff, there are genuine issues of material fact on this issue.   First, as conceded by Schlender in his deposition, there was a lapse of several months between the August 2007 date he first learned about Plaintiff's sexual harassment allegations against him and the November 2007

---

[1]Defendant does not argue that Plaintiff cannot establish the other elements of her sexual harassment claim; i.e., that she "belonged to a protected group," that she "was subject to communication or conduct on the basis of sex," that she "was subjected to unwelcome sexual conduct or communication" that "was intended to or in fact did substantially interfere with [her] employment or created an intimidating, hostile, or offensive work environment." *Chambers*, 614 N.W.2d at 915.

17

date when he was finally interviewed about those allegations.   Moreover, Schlender testified that he does not recall being asked earlier to make time for an interview. (Schlender Dep. at 49-54.)   Furthermore, despite the serious nature of the allegation, Schlender testified that he was never asked about the Saran wrap comment that Plaintiff attributed to him.  (Schlender Dep. at 27.)  This omission is also reflected in Ms. Jones notes regarding the Schlender interview and Schlender's written statement.  (Def.'s Exs. I and N.)  District Manager Imad Mustafa likewise testified that he does not recall Schlender being questioned about the Saran wrap comment.  (Mustafa Dep. at 80-81.)

General Manager Dennis Gordon testified that the delay in the investigation and in particular Schlender's interview was attributed to Schlender's vacation and leave of absence due to the illness and then death of his fiance/wife. (Gordon Dep. at 99.)  The evidence presented, however, reveals that Schlender was present working in the restaurant in August and September 2007, before Plaintiff resigned.   Schlender did not take his vacation/leave of absence until September 5, 2007, within minutes of Defendant's employment relations department learning that Plaintiff had "walked off" the job. (Def.'s Ex. I.)  He was also back to work for almost a month before his November 9, 2007 interview. (*Id.*)

More importantly, there is evidence creating a genuine issue of material fact whether Defendant failed to take provisional remedial action while the sexual harassment investigation was pending.   An employer's "[n]otice of the sexually harassing conduct triggers [its] duty to take prompt corrective action that is reasonably calculated to end the harassment." *Swenson v. Potter*, 271 F.3d 1184, 1192 (9th Cir. 2001) (internal quotation marks and citations omitted).  "This obligation actually has two parts.  The first consists of

18

the temporary steps the employer takes to deal with the situation while it determines whether the complaint is justified.  The second consists of the permanent remedial steps the employer takes once it has completed its investigation."  *Id.*  At issue here is whether Defendant failed to take the necessary temporary steps required while its investigation was on-going; i.e., its failure to grant Plaintiff's request that she not be required to work the same shift with Schlender.

After filing a complaint against Schlender, Plaintiff requested that Defendant accommodate her request not to work alongside the man she was accusing of sexual harassment.  She informed Ms. Lanius from Defendant's employment relations office that Schlender knew that it was she who made the allegations, that Schlender had tried to get her to close the restaurant alone with him, and that she was afraid to be alone at the restaurant with Schlender.  (*Id.* at 9, 8/21/07 4:42 p.m. entry.)  Ms. Lanius emailed this information to both Mustafa and Gordon.  (*Id.*)  Gordon testified that Schlender was allowed to continue as Plaintiff's supervisor during the investigation.  (Gordon Dep. at 75-76.)  Plaintiff testified that she asked Gordon, while the investigation was on-going, whether he could arrange it so she did not have to work the same shift as Schlender, but he denied her request.  (Pl.'s Dep. at 100-101.)  At the time Plaintiff made this request, her allegations of Schlender's sexually harassing conduct had been confirmed to Gordon by employees Julie LaPorte, Leo Hicks (cook and shift leader), and Andrew or Andy Z (cook).  Gordon does not recall refusing Plaintiff's request, but testified that he would have denied it because he would not want to show any bias or discrimination against Schlender until the investigation was completed.  (Gordon Dep. at 66.)

19

In light of the above, Defendant's motion for summary judgment as to Plaintiff's claim of sexual harassment is denied. The Court now addresses her claims that she was retaliated against and constructively discharged.

## B.  Retaliation and Constructive Discharge

Defendant next argues that Plaintiff's retaliation claim must be dismissed because she cannot prove that she suffered an adverse employment action that is causally connected to her sexual harassment complaints. Plaintiff responds with evidence supporting her claim that she was constructively discharged and thus suffered an adverse employment decision because Schlender was allowed to supervise her work and intimidate her while the investigation was continuing. She thus argues that genuine issues of material fact exist for trial. This Court agrees with Plaintiff.

In *Champion v. Nationwide Security, Inc.*, 545 N.W.2d 596, 600 (Mich. 1996), the Michigan Supreme Court observed that "[i]t is well established that the law does not differentiate between employees who are actually discharged and those who are constructively discharged. In other words, once individuals establish their constructive discharge, they are treated as if their employer had actually fired them." So, evidence that shows Plaintiff was constructively discharged is treated in the same manner as evidence that she was fired in retaliation for complaining about Schlender's sexual harassment. *See Vasquez v. Atrium Door and Window Co. of Arizona*, 218 F. Supp.2d 1139, 1141-43 (D. Ariz. 2002) (adopting the majority view that a constructive discharge constitutes a tangible employment action for Title VII discrimination actions); *cf. Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002) (observing that "[f]or a transfer or reassignment to amount to a constructive discharge, its conditions must be objectively intolerable to a

20

reasonable person" and further observing that "[w]hen a reassignment rises to the level of a constructive discharge, . . . the reassignment is an adverse employment action.")

Considering the evidence presented in the light most favorable to Plaintiff, a genuine issue of material fact exists whether Plaintiff was constructively discharged and retaliated against by Schlender for making allegations of sexual harassment against him.  Plaintiff testified that, while the investigation was on-going, Defendant allowed Schlender to supervise her.  Evidence from Defendant's employment relations department supports Plaintiff's claim that Schlender was attempting to arrange it so that he and Plaintiff were alone when the restaurant closed and that Plaintiff was afraid to do so because Schlender knew she was the one who had made the allegations against him.  It is not disputed that Schlender was aware of the fact that it was Plaintiff who made the allegations against him. Plaintiff also testified that, while the investigation was continuing, Schlender was engaging in conduct that was intimidating and threatening to her.  In fact, she attributes his conduct as the trigger for the anxiety attack that she suffered at the restaurant immediately before she submitted her resignation and as the reason she submitted that resignation. Accordingly, Defendant's motion for summary judgment on Plaintiff's claims of retaliation and constructive discharge is DENIED.

**IV.  Conclusion**

For the foregoing reasons, Defendant's motion for summary judgment is DENIED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  August 25, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 25, 2009, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager

22